IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| THOMAS GRAHAM, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| v. | ) | 1:19-cv-163 (LMB/TCB) |
| CITY OF MANASSAS SCHOOL BOARD, d/b/a Manassas City Public Schools, et al., | ) | |
| Defendants. | ) | |

CONSOLIDATED WITH

| ALAN LANIER, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| v. | ) | 1:19-cv-164 (LMB/TCB) |
| CITY OF MANASSAS SCHOOL BOARD, d/b/a Manassas City Public Schools, et al., | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

In the mid-1990s, Thomas Graham ("Graham") and Alan Lanier ("Lanier"), plaintiffs in these consolidated civil actions, were the victims of child sexual abuse at the hands of Steffon Rodney Christian ("Christian"), a former employee of Baldwin Elementary School ("Baldwin Elementary"). Christian was arrested in 2011 and ultimately pleaded guilty to 22 counts of sex crimes against minors, including crimes against plaintiffs. Graham and Lanier, now adults, have sued Christian as well as the City of Manassas School Board (the "School Board") and Alice H. Howard ("Howard"), who was Baldwin Elementary's principal at the time (collectively, "defendants"), alleging federal claims under Title IX of the Education Amendments Act of 1972

and 42 U.S.C. § 1983 as well as state law claims of gross negligence, battery, assault, and intentional infliction of emotional distress.

Before the Court are the School Board's and Howard's motions to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure.[1] For the reasons that follow, the School Board's motions will be granted in their entirety; Howard's motions will be granted in part and denied in part; and all counts of plaintiffs' complaints except for the gross negligence claims against Howard will be dismissed.

I.

A.[2]

Christian began working at Baldwin Elementary in 1981. He started as a kindergarten instructional assistant and, in 1987, switched to library secretary. He also coached the boys' basketball team and ran the school safety patrol program. Christian used these positions to develop inappropriately close relationships with male Baldwin Elementary students. He gave them gifts and money and supplied them with pornography. He occasionally spent time with students outside school grounds and after school hours, on golf outings and at his home. Christian's efforts to cultivate connections with male students were designed to "groom" them for sexual abuse, and ultimately he forced many of them to engage in various sexual acts with him, both at school and in his home.

---

[1] Although these civil actions have been consolidated for pretrial purposes, the School Board and Howard each filed separate motions as to Graham and Lanier. Each defendant's motions raise essentially the same arguments, as do plaintiffs' responses to those motions.

[2] The following facts are drawn from the allegations in plaintiffs' complaints and, for purposes of analyzing defendants' motions to dismiss, are assumed to be true.

Graham was a student at Baldwin Elementary from 1992 to 1995, for fourth through sixth grade. When he started fourth grade, he heard from an older sixth-grade student that Christian was a "child molester." Graham had never heard the term before, and the comment did not prevent him from becoming close with Christian. Their relationship began when Christian helped Graham recover his stolen bicycle. By the time Graham was in fifth grade, Christian began sexually abusing him in the video room and equipment closet that was attached to Chistian's office in the library. That abuse continued throughout the summer after Graham graduated from Baldwin Elementary in 1995. Once, when Graham was in ninth grade, he was molested by Christian at Christian's home.

Lanier was a student at Baldwin Elementary from 1990 to 1993, also for fourth through sixth grade. Christian began grooming Lanier in fourth grade, asking him to join the boys' basketball team and safety patrol. When Lanier was in fifth grade, Christian began asking him about sex, pornography, and other inappropriate topics. Christian spent a substantial amount of time with Lanier, playing sports and helping him with homework. Unlike in Graham's case, Christian's sexual abuse of Lanier did not begin until Lanier had graduated from Baldwin Elementary. In 1995, when Lanier was in eighth grade, Christian brought Lanier to his home and forced Lanier to perform sex acts. That summer, he abused Lanier several times in his Baldwin Elementary office. The abuse continued until 1999, when Lanier was in high school. In an effort to cover his crimes, Christian bribed Lanier to stay quiet and threatened him with violence if he told anyone what was happening.

Despite Christian's efforts to hide his misconduct, there were signs that something was amiss. It was a matter of public knowledge that Christian had close relationships with many boys enrolled at Baldwin Elementary and often spent time with them at school and beyond

3

school grounds. Graham's mother told Howard, Baldwin Elementary's principal at the time, that she felt Christian's relationships with boys were troubling. Lanier's mother had a similar conversation with Howard. A school administrator publicly expressed concerns about Christian, and a third-grade teacher observed that Christian's relationships with male students were inappropriately close. In 1996, someone contacted the local police department to urge an investigation into whether Christian was abusing male students. The police reached out to Howard to gather evidence related to these allegations, but Howard was allegedly "hostile" to such efforts, and no charges were filed at that time.

In late 2011, Christian was arrested and charged with four counts of sexually abusing one male student at Baldwin Elementary in the mid-1990s. This arrest encouraged other victims, including the plaintiffs, to come forward with their allegations of having been sexually abused. In June 2012, Christian pleaded guilty to 22 criminal charges, which included charges of sodomy and aggravated sexual battery involving Graham and Lanier. He remains incarcerated in the custody of the Virginia Department of Corrections.

Both plaintiffs, who turned 18 in the late 1990s or early 2000s,[3] have suffered long-term injuries as a result of Christian's abuse. Lanier's severe psychological distress stemming from the abuse has resulted in nightmares, an inability to trust others or form meaningful romantic relationships, and a dependency on alcohol. He also suffers from extreme anxiety and has been suicidal. Graham had been unable to concentrate or behave in class, and as a result he failed ninth grade. His academic problems continued and, in 2004, he dropped out of college due to

---

[3] Plaintiffs' complaints do not mention their dates of birth; however, based on the ages and grades mentioned in the complaints, it can be extrapolated that Lanier turned 18 in 1999 or 2000 and that Graham turned 18 in 2000 or 2001.

psychological distress. He has struggled with guilt, anxiety, depression, and substance abuse, and he too has difficulty trusting others or forming romantic relationships. In August 2017, both Graham and Lanier saw Dr. Brian Zimnitsky ("Dr. Zimnitsky"), who informed them about the "causal connection" between the sexual abuse they suffered at Christian's hands and the "psychiatric injuries" they have experienced.

B.

On February 8, 2019, nearly seven years after Christian was convicted and sentenced, Graham and Lanier filed these civil actions. Each plaintiff's eight-count complaint names Christian, the School Board,[4] and Howard[5] as defendants. Counts I through IV assert federal law claims against the School Board and Howard. Specifically, Count I alleges discrimination or exclusion from participation in educational activities in violation of Title IX. Counts II through IV allege three theories of liability under § 1983 for deprivation of plaintiffs' constitutional rights to be free from sexual assault[6]: failure to train (Count II), supervisory liability (Count III),

---

[4] Under Virginia law, the school board is the corporate entity empowered to (among other things) "operate and maintain the public schools in the school division"; "[s]ee that the school laws are properly explained, enforced and observed"; and "take care that th[e schools] are conducted according to law and with the utmost efficiency." Va. Code Ann. § 22.1-79(1), (2), (5).

[5] Under Virginia law, a principal is "the instructional leader and manager of the school and is responsible for," among other things, "[f]ostering the success of all students by developing, advocating, and sustaining an academically rigorous, positive, and safe school climate"; "[f]ostering effective human resources management by appropriately assigning, selecting, inducting, supporting, evaluating, and retaining quality instructional and support personnel"; "ensuring that students are provided an opportunity to learn"; and "[i]nvolv[ing] students, staff, parents, and the community to create and sustain a positive, safe, and healthy learning environment that enforces state, division, and local rules, policies, and procedures." 8 Va. Admin. Code § 20-131-210(A)-(B).

[6] See, e.g., Doe v. Taylor Indep. Sch. Dist., 15 F.3d 443, 445 (5th Cir. 1994) (holding "that schoolchildren . . . have a liberty interest in their bodily integrity that is protected by the Due Process Clause of the Fourteenth Amendment and that physical sexual abuse by a school employee violates that right"); see also Hall v. Tawney, 621 F.2d 607, 613 (4th Cir. 1980) ("The existence of this right to ultimate bodily security—the most fundamental aspect of personal

5

and state-created danger (Count IV). Count V, also asserted against the School Board and Howard, alleges gross negligence in violation of Virginia law. Finally, Counts VI through VIII are state law claims alleging that all three defendants are liable for battery (Count VI), assault (Count VII), and intentional infliction of emotional distress (Count VIII).

In response to defendants' motions to dismiss, plaintiffs concede that several of these claims should not go forward. First, because Christian is incarcerated and thus deemed to be incapacitated under state law, see Va. Code Ann. § 8.01-9(A),[7] plaintiffs have voluntarily dismissed him from this civil action. Second, plaintiffs have consented to dismissal, against Howard only, of Counts I, VI, VII, and VIII.[8] Plaintiffs' concessions leave Count I (Title IX, against the School Board); Counts II, III, and IV (§ 1983, against the School Board and Howard); Count V (gross negligence, against the School Board and Howard); and Counts VI, VII, and VIII (battery, assault, and intentional infliction of emotional distress, respectively, against the School Board) as the only counts at issue.

---

privacy—is unmistakably established in our constitutional decisions as an attribute of the ordered liberty that is the concern of substantive due process.").

[7] Virginia law provides that where a civil defendant is incarcerated, the court "shall appoint a discreet and competent attorney-at-law as guardian ad litem to such defendant." Va. Code Ann. § 8.01-9(A); see Fed. R. Civ. P. 17(b) ("Capacity to sue or be sued is determined . . . by the law of the individual's domicile"); see also id. r. 17(c) ("The court must appoint a guardian ad litem—or issue another appropriate order—to protect a minor or incompetent person who is unrepresented in an action.").

[8] Plaintiffs' Title IX claim (Count I) against Howard must be dismissed because "school officials may not be sued in their individual capacity under Title IX." Kinman v. Omaha Pub. Sch. Dist., 171 F.3d 607, 611 (8th Cir. 1999). Plaintiffs' battery, assault, and intentional infliction of emotional distress claims (Counts VI through VIII) against Howard must be dismissed because the complaints do not allege any tortious actions taken by Howard herself and because under state law, a school principal is not vicariously liable for torts committed by a school employee.

6

II.

A complaint should be dismissed under Rule 12(b)(6) if it "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. The plausibility standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. (quoting Twombly, 550 U.S. at 570). The Court must "assume the facts alleged in the complaint are true and draw all reasonable factual inferences in [the plaintiff's] favor," Burbach Broad. Co. of Del. v. Elkins Radio Corp., 278 F.3d 401, 406 (4th Cir. 2002), but only to the extent those allegations pertain to facts rather than legal conclusions. Iqbal, 556 U.S. at 678-79.

III.

The School Board and Howard move to dismiss the remaining claims on several independent grounds. Both defendants argue that plaintiffs' federal law claims, and at least some of the state law claims, are untimely. The School Board also argues that as an arm of the state, it enjoys sovereign immunity from plaintiffs' state law claims. And both defendants argue that to the extent any of plaintiffs' counts are timely and not barred by immunity, they fail to state a plausible claim for relief under Twombly and Iqbal. Each of these arguments is analyzed below.

A.

The School Board and Howard first argue that plaintiffs' claims under Title IX and § 1983 are barred by the statute of limitations. Although the parties largely agree on the relevant

legal principles, plaintiffs urge the Court to find that their federal law claims are timely. As explained below, defendants have the better argument, and plaintiffs' federal law claims will be dismissed. See Semenova v. Md. Transit Admin., 845 F.3d 564, 567 (4th Cir. 2017) (holding that a court may grant a Rule 12(b)(6) motion on statute of limitations grounds "if the time bar is apparent on the face of the complaint" (citation omitted)).

Although neither Title IX nor § 1983 contains any provisions addressing the statute of limitations, the parties agree that the relevant limitations period for plaintiffs' federal law claims is two years. The Supreme Court has held that the limitations period for all § 1983 claims is determined by reference to the forum state's general or residual personal injury statute. See Owens v. Okure, 488 U.S. 235, 249-50 (1989); Wilson v. Garcia, 471 U.S. 261, 271-76, 280 (1985). Although Owens and Wilson addressed § 1983, "every circuit to consider the issue has held that Title IX also borrows the relevant state's statute of limitations for personal injury." Wilmink v. Kanawha Cty. Bd. of Educ., 214 F. App'x 294, 296 n.3 (4th Cir. 2007) (per curiam) (quoting Stanley v. Trs. of the Cal. State Univ., 433 F.3d 1129, 1134 (9th Cir. 2006)). Accordingly, the limitations period applicable to plaintiffs' Title IX and § 1983 claims is Virginia's two-year statute for personal injury actions. See Va. Code Ann. § 8.01-243(A) ("Unless otherwise provided in this section or by other statute, every action for personal injuries, whatever the theory of recovery, and every action for damages resulting from fraud, shall be brought within two years after the cause of action accrues.").

The parties likewise agree that when a federal court borrows a state's statute of limitations, it must also borrow that state's "coordinate tolling rules." Hardin v. Straub, 490 U.S. 536, 539 (1989) (citation omitted); see also Wilson, 471 U.S. at 269 (holding that not only "the length of the limitations period" but also "closely related questions of tolling and application . . .

are to be governed by state law"). As relevant here, Virginia's tolling statute provides that if an individual's cause of action accrues while the individual is a minor, "the time during which he is within the age of minority shall not be counted as any part of the period within which the action must be brought." Va. Code Ann. § 8.01-229(A)(2)(a). Consequently, each plaintiff's Title IX and § 1983 claims must be tolled for any period before that plaintiff turned 18.

Although the parties agree on the relevant time period and tolling principles, they disagree sharply over the issue of accrual. Plaintiffs argue that their federal causes of action did not accrue until August 2017, when Dr. Zimnitsky informed each plaintiff of the causal connection between his psychological problems and having been abused by Christian. Plaintiffs base their accrual argument on a state statute and on federal common-law principles. Neither source supports their argument.

In their complaints, plaintiffs purport to rely on section 8.01-249(6) of the Virginia Code, which provides that any action "for injury to the person, whatever the theory of recovery, resulting from sexual abuse occurring during the infancy . . . of the person" is deemed to accrue "upon the later of the removal of the disability of infancy . . . or when the fact of the injury and its causal connection to the sexual abuse is first communicated to the person by a licensed physician, psychologist, or clinical psychologist." But section 8.01-249(6) does not apply to plaintiffs' federal law claims. As the Supreme Court has made clear, "the accrual date of a § 1983 cause of action is a question of federal law that is not resolved by reference to state law." Wallace v. Kato, 549 U.S. 384, 388 (2007) (emphasis in original); see Owens v. Balt. City State's Attorneys Office, 767 F.3d 379, 388-89 (4th Cir. 2014) ("Although state law determines the applicable statute of limitations for § 1983 claims, federal law governs the date on which that limitations period begins to run."). The Court reaffirmed that principle this Term. See

McDonough v. Smith, No. 18-485, slip op. at 4 (U.S. June 20, 2019) ("[T]he time at which a § 1983 claim accrues is a question of federal law, conforming in general to common-law tort principles." (internal quotation marks and citation omitted)). Under these decisions, the relevant accrual principles for plaintiffs' Title IX and § 1983 claims are found in federal common law, not in section 8.01-249(6).[9] And under federal common law, the "standard rule" is "that accrual occurs . . . when the plaintiff knows or has reason to know of his injury." Owens, 767 F.3d at 389 (quoting Wallace, 549 U.S. at 388).

In their oppositions to defendants' motions to dismiss, plaintiffs abandon the section 8.01-249(6) argument. Instead, recognizing that section 8.01-249(6) does not apply of its own accord, they argue that "'reasonableness' changes with the circumstances" and that the policy judgment underlying section 8.01-249(6) is "instructive" with respect to when Graham and Lanier reasonably should have known of their injuries. E.g., Graham's Opp'n to Board 9. That is, although they purport to apply the federal knew-or-reasonably-should-have-known standard, plaintiffs contend that at least in this context, it produces the same result as the state child sexual abuse provision. This argument is not persuasive. For one thing, section 8.01-

---

[9] A wealth of case law supports this conclusion. For example, in Varnell v. Dora Consolidated School District, 756 F.3d 1208 (10th Cir. 2014), the plaintiff brought claims against a school district for damages arising out of sexual abuse she suffered at the hands of a former coach; defendants sought dismissal on statute-of-limitations grounds; and the plaintiff argued that New Mexico's statute for accrual of claims based on child sexual abuse shielded her complaint from dismissal. Id. at 1210. The Tenth Circuit disagreed. Relying on a Ninth Circuit decision, the court reasoned that incorporating a state's offense-specific accrual rules "would . . . frustrate the federal interest in uniformity and the interest in having firmly defined, easily applied rules" and declined to "apply the residual statute of limitations, only to then adopt a tort-specific tolling provision." Id. at 1212-13 (quoting Bonneau v. Centennial Sch. Dist. No. 28J, 666 F.3d 577, 580 (9th Cir. 2012)). At least two other courts of appeals have reached the same conclusion. See Woods v. Ill. Dep't of Children & Family Servs., 710 F.3d 762, 766-67 (7th Cir. 2013); Kach v. Hose, 589 F.3d 626, 634 (3d Cir. 2009).

249(6) and other state provisions like it were enacted precisely because standard accrual rules were resulting in the dismissal of too many claims of survivors of child sexual abuse who only realized the extent and nature of the harms they had suffered years after the abuse was inflicted. It would be peculiar to hold that the standard rule rather than the specialized rule applies, only to then discover that the standard rule is capacious enough to capture the specialized rule's intended effect. For another, plaintiffs' interpretation of "knows or has reason to know" would effectively erase the second half of the rule, providing for accrual only once a victim becomes subjectively aware of his injuries based on conversations with a licensed psychiatrist. That view of accrual is much too inflexible. Most important, plaintiffs' argument ignores the effect of their own allegations. To be sure, the federal standard does not require all victims of child sexual abuse "to magically realize as of the date they turn 18 that their current or potential future injuries were connected to the sexual abuse." E.g., Graham's Opp'n to Board 9. After all, sexual abuse of a minor is particularly heinous in part because the victim often cannot fully comprehend the abuse or its effects for years. Yet that is not to say that a formal psychological diagnosis is the only way in which a victim could be deemed to have "reason to know" about his injuries. To the contrary, federal common-law principles on accrual hold that once an injured party is "in possession of the critical facts that he has been hurt and who has inflicted the injury," the law imposes on him a reasonable duty to inquire as to who, if anyone, may be held accountable. See United States v. Kubrick, 444 U.S. 111, 122 (1979).

Here, whatever might be said for Graham's or Lanier's ability to understand how or by whom they had been injured as of the date each turned 18, the situation changed dramatically once Christian was arrested in late 2011. Christian's arrest encouraged Graham and Lanier—both of whom were nearly 30 years old—to come forward and identify themselves as victims.

11

Because they did so, Christian was charged with, and ultimately pleaded guilty to, additional sexual offenses, including offenses against plaintiffs. Even assuming (as the Court must, given the posture of these actions) that plaintiffs remained subjectively unaware of any causal connection between Christian's abuse and their substance abuse and psychological problems, the law nonetheless imposed on them a duty to look into their having been victims of sexual abuse to determine whether such injuries gave rise to potential liability. To reiterate, the Court does not hold that Graham and Lanier were placed on inquiry notice of their injuries simply by turning 18. Rather, under the specific facts alleged in the complaints, Christian's public prosecution and plaintiffs' self-identification as victims of Christian's offenses fairly started the time period within which plaintiffs had to file their lawsuits. Graham's and Lanier's failure to do so in a timely fashion renders their federal law claims subject to dismissal.

Plaintiffs' final argument, that "[c]hild victims <u>must</u> be given a chance to vindicate the fallout of sexual abuse," <u>e.g.</u>, Graham's Opp'n to Board 9 (emphasis in original), does not overcome the applicable law. All statutes of limitations embody a delicate policy judgment as to the proper balance "between the substantive policies underlying the . . . claim and the policies of repose." <u>Wilson</u>, 471 U.S. at 270. With respect to federal causes of action asserted under Title IX and § 1983, that judgment is Congress's, and not this Court's, to make. Because the applicable accrual principles establish that plaintiffs' Title IX and § 1983 claims are untimely, those claims must be dismissed.[10]

---

[10] The School Board and Howard each advanced additional reasons why plaintiffs' Title IX and § 1983 claims are factually or legally insufficient. In light of the finding that all the federal law claims are untimely, the Court need not address those alternative arguments.

12

B.

Counts V through VIII of each plaintiff's complaint allege that the School Board is liable for gross negligence, battery, assault, and intentional infliction of emotional distress. The School Board argues that these state law tort claims are untimely and barred by common-law sovereign immunity. Because the Court finds that the School Board is entitled to sovereign immunity, there is no need to address the alternative statute-of-limitations argument.

The common-law doctrine of sovereign immunity "is 'alive and well' in Virginia." City of Chesapeake v. Cunningham, 604 S.E.2d 420, 426 (Va. 2004) (quoting Niese v. City of Alexandria, 564 S.E.2d 127, 132 (Va. 2002)). "Sovereign immunity is a rule of social policy, which protects the state from burdensome interference with the performance of its governmental functions." Id. (quoting City of Va. Beach v. Carmichael Dev. Co., 527 S.E.2d 778, 781 (Va. 2000)). Municipal or governmental entities in Virginia enjoy sovereign immunity with respect to their "governmental" functions—that is, those they perform "exclusively for the public welfare" and which "entail[] the exercise of [the] entity's political, discretionary, or legislative authority." Id. But there is no such immunity arising from the exercise of merely "proprietary" functions—that is, any function that "is a ministerial act and involves no discretion." Id. Although the line between proprietary and governmental functions is sometimes difficult to discern, Virginia courts have made clear that "when a municipality plans, designs, regulates or provides a service for the common good, it performs a governmental function." See id. at 426-27 (collecting cases). Virginia courts have also recognized that school boards are arms of the state that perform a vital governmental function and are thus shielded by sovereign immunity. See, e.g., Kellam v. Sch. Bd., 117 S.E.2d 96, 97 (Va. 1960) ("The basis for a school board's immunity from liability

for tortious injury has been generally found in the fact that it is a governmental agency or arm of the state and acts in a governmental capacity in the performance of its duties imposed by law.").

Plaintiffs do not squarely dispute that school boards are usually immune from liability for activities involving operating a school, educating young members of the community, and managing the students' safety and educational experiences. After all, these are quintessential governmental activities. Instead, plaintiffs attempt to reframe the issue by arguing that "actively ignor[ing] known sexual abuse and tr[ying] to cover up [that abuse] by preventing the police from investigating" cannot constitute "governmental" functions because those actions are intended for the benefit of the institution rather than the public and thus lose whatever character of governmental immunity they may have possessed. E.g., Graham's Opp'n to Board 21 (emphasis omitted). This is a novel, unsupported, and unconvincing view of immunity. An act performed during the course of a governmental function does not lose that character simply because it was performed negligently, inappropriately, or otherwise unlawfully. Were that the case, there would be no point to sovereign immunity in the first place. Plaintiffs' claims arise out of the School Board's management of its schools, supervision of teachers, and investigation of possible inappropriate conduct. Those functions are discretionary and form a necessary part of the School Board's exercise of its delegated duties to ensure the safe educational experience of children in the community. As such, claims arising from the exercise of those functions are entitled to common-law immunity.

In a last-ditch effort to salvage at least one of their claims against the School Board, plaintiffs argue that "one Virginia court has recognized that sovereign immunity does not extend to claims of gross negligence against a school board." E.g., Graham's Opp'n to Board 21 (citing Simpson v. Thorsen, No. CL 10-827, 2012 WL 7827847 (Va. Cir. Ct. Jan. 31, 2012)). But the

14

case to which plaintiffs point does not withstand scrutiny. In fact, it is demonstrably wrong. In announcing that it is "well-settled that sovereign immunity does not apply where gross negligence is alleged," 2012 WL 7827847, at *3 (citing Couplin v. Payne, 613 S.E.2d 592, 595 (Va. 2005), and Colby v. Boyden, 400 S.E.2d 184, 186 (Va. 1991)), the Simpson court was conflating two distinct legal concepts: the sovereign immunity enjoyed by municipal entities performing governmental functions (which is absolute) and that enjoyed by municipal agents performing those functions (which is not). The cases upon which Simpson relied make clear that "[i]n Virginia, a government agent entitled to the protection of sovereign immunity is not immunized from suit. Rather, the degree of negligence which must be shown to impose liability is elevated from simple to gross negligence." Couplin, 613 S.E.2d at 595 (quoting Colby, 400 S.E.2d at 186). Thus, the School Board is immune from plaintiffs' tort claims—regardless whether those claims sound in simple negligence, gross negligence, or intentional torts—because those claims arise out of the School Board's performance of a governmental function. Cf., e.g., Croghan v. Fairfax Cty. Sch. Bd., No. 202460, 2002 WL 1941177, at *1-2 (Va. Cir. Ct. May 22, 2002) ("[T]he immunity shared by the state and its agencies (including school boards) is absolute and applies as a bar to liability whether the degree of alleged negligence is simple or gross."). Accordingly, plaintiffs' state law tort claims against the School Board will be dismissed.

C.

The only live count remaining in each complaint is a gross negligence claim against Howard. Although Howard attempts to argue that the gross negligence counts cannot pass muster under Twombly and Iqbal, her arguments are unpersuasive. Under Virginia law, gross negligence represents "a degree of negligence showing indifference to another and an utter disregard of prudence that amounts to a complete neglect of the safety of such other person."

Elliott v. Carter, 791 S.E.2d 730, 732 (Va. 2016) (quoting Cowan v. Hospice Support Care, Inc., 603 S.E.2d 916, 918 (Va. 2004)). As pleaded, plaintiffs' complaints satisfy this standard because Howard had many reasons to know Christian was developing inappropriately close relationships with young boys enrolled in Baldwin Elementary yet took no action to investigate Christian's conduct or intervene. Christian openly consorted with the students around the school, displayed affection for them, was closely involved with their lives, and often saw the boys on trips outside of schools. Both Graham's and Lanier's mothers complained about the relationship he was developing with each boy. Indeed, the allegations suggest that Christian's inappropriate conduct was a poorly kept secret of which the principal must, or at least should, have been aware. For example, the complaints allege that a sixth-grade boy told Graham in 1992 that Christian was a child molester and that an administrative staff member at the elementary school also came forward to express concerns. Indeed, in 1996, after having been informed of concerns about Christian's behavior, local police attempted to investigate those allegations; although no criminal charges resulted from those efforts, the investigation certainly put Howard on notice that there were reasons to be concerned. The complaints further allege that when faced with these troubling accounts, rather than taking precautions to restrict Christian's access to children or attempting to discover the true nature of his relationships with students, Howard instead made no effort to investigate, no effort to restrict Christian's one-on-one interactions with students, no effort to curtail Christian's inviting students into his home or his office in the library, and no effort to protect the livelihood and welfare of the students entrusted to her control. These allegations are sufficient at the pleading stage to allege a plausible gross negligence claim against Howard.

IV.

For the reasons stated above, the School Board's motion to dismiss will be granted, Howard's motion to dismiss will be granted in part and denied in part, and all of the counts of plaintiffs' complaints except for the gross negligence claims against Howard (Count V of each complaint) will be dismissed by an appropriate Order to be issued with this Memorandum Opinion.

Entered this 1st day of July, 2019.

Alexandria, Virginia

/s/ *Leonie M. Brinkema*
Leonie M. Brinkema
United States District Judge